(M'Credy *v.* The Schuylkill Navigation Company.)

---

## M'CREDY *against* THE SCHUYLKILL NAVIGATION COMPANY.

### IN ERROR.

1. Evidence of the contents of an instrument alleged to have been lost cannot be given without previous proof of its due execution, which includes

---

* See *ante* 87; 2 Harris 70, 133; 3 Id. 22; act of May 4, 1852, P. L. 574, Pur. Dig. 47, ¿ 3.

(M'Credy *v.* The Schuylkill Navigation Company.)

proof of its delivery; and where a witness called to prove the former existence of an instrument, testified that it had been put into the hands of A. as an *escrow*, and A. on his examination said that he could not recollect on what occasion, or with certainty to whom it was given up, and that he should not have given it up without the consent of both parties, it was *held*, that evidence of the contents of the instrument was properly rejected.

2. In an action of covenant on an agreement by which the defendant covenanted to raise a certain dam to a certain number of inches above its then height, and to maintain and keep it at that height, and in good order, casualties excepted, it was *held*, that evidence was not admissible on the part of the plaintiff, to show the condition of the dam previous to the agreement.

3. In covenant on articles of agreement by which the defendants, (the Schuylkill Navigation Company,) covenanted to raise a certain dam, and to maintain it at a certain height, it was *held*, that persons employed as superintendents and agents of the defendants in repairing a breach in the dam, were competent witnesses for the defendants, to prove that repairs were made with all due expedition, and in a proper manner.

THIS was a writ of error to the Court of Common Pleas of the County of Delaware, to remove the record of an action of covenant, brought by Bernard M'Credy, against The President, Managers and Company of the Schuylkill Navigation Company.

The action was brought in the Common Pleas of Montgomery County to August term, 1834, and removed for trial to Delaware County.

The declaration set forth,—

"That whereas by certain articles of agreement made, at Montgomery county aforesaid, the eighth day of October, in the year of our Lord one thousand eight hundred and nineteen, between the aforesaid "The President, Managers and Company of the Schuylkill Navigation Company" of the one part, and Levi Pawling, by the name of Levi Pawling of Norristown in the county of Montgomery and State of Pennsylvania, Esquire of [*425] the other part, [the title of *which said Levi to the estate in said articles of agreement mentioned and hereafter more fully recited, by virtue of divers conveyances and assurances, is now in part vested in said Bernard,] which said articles of agreement with the seal of the said "The President, Managers and Company of the Schuylkill Navigation Company" sealed, the said Bernard here into Court brings, the date whereof is the same day and year aforesaid, it was concluded and agreed by and between the said "The President, Managers and Company of the Schuylkill Navigation Company" and the said Levi Pawling, in manner following, to wit: the said "The President, Managers and Company of the Schuylkill Navigation Company" did, by the same articles, promise, covenant, and agree to and with the said Levi Pawling, his heirs and assigns, that they, the

(M'Credy *v.* The Schuylkill Navigation Company.)

said "The President, Managers and Company of the Schuylkill Navigation Company," should and would at the expense of the said company, erect and build a dam across the river from the middle of the small island near the said Levi Pawling's mill, therein mentioned, to the south-western shore of said river, in such a direction as will pass between the lower end of an island, called Barbadoes Island, therein more fully mentioned, and a small island a few perches to the southward thereof; that the said dam should be erected of good materials, and that the top of it should be in every part, as near as may be, on a perfect level and seven feet in perpendicular height above the sheeting under the water-wheels of the said Levi Pawling's wheat or corn mills aforesaid, [as in and by said articles of agreement amongst other things more fully appears.]

In consideration whereof the said Levi Pawling covenanted, promised and agreed to and with the said "The President, Managers and Company of the Schuylkill Navigation Company," that he would erect, build and finish at his own expense a dam in a line with the said company's dam, to extend from the north-eastern shore of said river near his mills to the middle of the said first-mentioned small island at a small distance from said shore: and the said dam should be erected of good materials, and that the top of it should be in every part thereof as high or higher than the top of said company's dam. Each of the said parties to uphold, support and forever to maintain and keep in good repair the dam or parts of dam to be by him or them respectively constructed as above-mentioned; and each party should cause his or their dam or parts of the said dam to be made and forever in future kept so close that not more than one-tenth part of the water of said river should be permitted to leak through or under the whole length of said dam: and in respect to the use to be made of the water of the said river, after allowing for the leakage of one-tenth part thereof through or under the said dam, it was mutually covenanted and agreed that the said Levi Pawling, his heirs and assigns, should be entitled to draw off five equal twelfth parts thereof for the use of his or their *mills or other water-works then or thereafter to be [*426] erected at or near Norristown; and that the said "The President, Managers and Company of the Schuylkill Navigation Company" should be entitled to draw off five equal twelfth parts thereof to be applied for mills or other water-powers on the south-western side of said river; and two twelfth parts thereof for the purpose of navigation; neither party to be ever at liberty to draw off the water below the level of the top of said dam to be erected by the said company: and further in consideration of

(M'Credy *v.* The Schuylkill Navigation Company.)

the covenants entered into by the said "The President, Managers and Company of the Schuylkill Navigation Company," the said Levi Pawling covenanted and agreed, that he, or his heirs or assigns, would bear, sustain and pay all damages that should, at any time thereafter, by any person or persons, be claimed and lawfully recovered either against him, his heirs or assigns, or against them the said "The President, Managers and Company of the Schuylkill Navigation Company," for or by reason of the erection of the said dam or dams, or of the swelling or flooding of the water thereby, and also, all costs, charges and expenses that should accrue from or by reason of all and every such claims forever thereafter. And further, in consideration of the covenants entered into by the said company, the said Levi covenanted and agreed for himself, his heirs and assigns, that he, his heirs, executors, administrators and assigns, should and would pay to the said "The President, Managers and Company of the Schuylkill Navigation Company" or to their treasurer, the sum of fifteen hundred dollars lawful money of the United States as soon as their part of said dam was completed and approved by the commissioners appointed by the governor of the commonwealth, [as by the same articles of agreement amongst other things more fully appears.]

And the said Bernard in fact saith, that although the said Levi Pawling, from the time of making of the said agreement, hitherto hath always been ready to perform and hath fully performed all and singular those things in the same agreement contained, which on the part of the said Levi Pawling were to be performed according to the true intent and meaning thereof; and although the said Bernard, since the vesting in him of the title of the said Levi Pawling, hitherto hath always been ready to perform, and hath fully performed all and singular those things in the same agreement contained, which on his part as assignee were to be performed according to the true intent and meaning thereof, yet the aforesaid, "The President, Managers and Company of the Schuylkill Navigation Company," their covenants aforesaid as in said agreement contained, have altogether disregarded and neglected to perform, and have not in accordance with and agreeably to the said covenants erected of good materials a dam across the said river, from the middle of a small island near the said Levi Pawling's mill above-mentioned to the south-western [*427] shore of the river, in such a direction *as will pass between the lower end of said Barbadoes island and a small island a few perches to the southward thereof, on a perfect level, and seven feet in perpendicular height above the sheeting under the water-wheels of the said Levi Pawling's wheat or corn mills aforesaid; nor have they the said "The President, Mana-

(M'Credy v. The Schuylkill Navigation Company.)

gers and Company of the Schuylkill Navigation Company" up-
held, supported, maintained or kept in good repair such a dam
as by their covenants aforesaid they promised and agreed to up-
hold, support and forever maintain and keep, but on the contrary
the dam erected by the said "The President, Managers and Com-
pany of the Schuylkill Navigation Company" was so badly, im-
properly, and inartificially erected and constructed and built,
that the same was broken, and a part thereof carried away upon
the ninth day of January in the year of our Lord one thousand
eight hundred and thirty-two; and upon the fourth day of Feb-
ruary in the same year, about eighty feet of the breast of the
said dam was completely and entirely carried away; and the
said the "President, Managers and Company of the Schuylkill
Navigation Company" altogether neglected and refused to renew
and put said dam into good repair for a long time, to wit, for
the space of about one hundred days: by reason whereof and of
the neglect of the said "The President, Managers and Company
of the Schuylkill Navigation Company" to perform their cove-
nants aforesaid entered into in the agreement aforesaid, the
wheat, corn, cotton and other mills and factories of the said
Bernard were for a long time, to wit, for the space of about one
hundred days, idle and unemployed, and the said Bernard de-
prived of any and every benefit therefrom, and entirely and alto-
gether deprived of the possession and enjoyment of the five equal
twelfth parts of the water aforesaid, secured to him by the cove-
nants of the company aforesaid, for the use and benefit of the
mills and factories aforesaid.

And the said Bernard, by his attorney aforesaid, in fact fur-
ther saith, That whereas, by certain articles of agreement made,
at Montgomery county aforesaid, the thirty-first day of August,
in the year of our Lord one thousand eight hundred and thirty,
between the aforesaid "The President, Managers and Company
of the Schuylkill Navigation Company," of the one part, and the
said Bernard M'Credy and one John Savage, of the other part,
which said articles, sealed with the seal of the said "The Presi-
dent, Managers and Company of the Schuylkill Navigation Com-
pany," the said Bernard brings here into Court, bearing date
the same day and year last abovesaid, reciting, That whereas the
said parties of the second part, under and by virtue of divers
conveyances and assurances, have become and now are seized and
entitled to the mill-seat, water-power, rights and privileges at
Norristown, in the county of Montgomery, on the north-eastern
side of the river Schuylkill, which were formerly of Levi Pawl-
ing, Esquire, of Norristown *aforesaid, and by virtue
thereof claim to be entitled to draw water from the river  [*428]
Schuylkill, above and near to the dam of the said party of the

(M'Credy *v.* The Schuylkill Navigation Company.)

first part, called the Norristown dam, for the use of their respect-
ive works, erected and constructed in that neighbourhood, it was
by the said articles concluded and agreed, covenanted and pro-
mised, by and between the said " The President, Managers and
Company of the Schuylkill Navigation Company," and the said
Bernard M'Credy and John Savage, and each and every of them
severally and apart, for and concerning the acts, deeds and de-
faults of himself only, and not any of them jointly with any other
of them, or for or concerning the acts, deeds and defaults of any
other of them ; that they the said " The President, Managers and
Company of the Schuylkill Navigation Company," should and
would, within one year from the date of said articles, at their
own proper cost and charge, raise their said dam, called the Nor-
ristown dam, not less than eighteen inches above its height
throughout its whole extent, as it then stood and existed, and
[casualties excepted] would maintain and keep it at that height
and in good order, [allowance of ten per cent. being made for
leakage] and in all cases of casualty, would repair and recon-
struct the same as soon as might be conveniently practicable ;
and it was further covenanted by the said, " The President, Man-
agers and Company of the Schuylkill Navigation Company," to
and with the said Bernard M'Credy and John Savage, that they
the said " The President, Managers and Company of the Schuyl-
kill Navigation Company" would bear all the damage, compen-
sation, costs, charges and expenses which might be recovered of
them, or to which they might be put by reason of raising the
said dam ; and it was further covenanted and agreed by the said
" The President, Managers and Company of the Schuylkill Navi-
gation Company," to and with the said Bernard and John, that,
after taking from the waters of the river Schuylkill so much as
might be requisite and necessary for the purposes of the Schuyl-
kill navigation as authorised by law, so that the same navigation
might be at all times fully supplied, the remainder of the said
water, after the said navigation should be as aforesaid fully sup-
plied, should be equally divided between them the said " The
President, Managers and Company of the Schuylkill Navigation
Company," and the said Bernard and John, their heirs, executors,
administrators and assigns, so that each might have one-half part
thereof to be used for mill power or such purposes other than the
navigation aforesaid, as the same might be lawfully used for, [as
in and by the same articles of agreement among other things
more fully appears.]

In consideration whereof the said Bernard M'Credy and John
Savage, and each of them severally and apart for and concern-
ing the acts, deeds and defaults of himself only, and not either
of them jointly with the other, or for or concerning the acts,

deeds and defaults of the other, did by the same articles of agreement covenant *and agree to and with the said "The [*429] President, Managers and Company of the Schuylkill Navigation Company," that they the said Bernard and John should and would pay to them "The said President, Managers and Company of the Schuylkill Navigation Company," at the execution of said articles, the sum of fifteen hundred dollars as a full indemnity therefor : It being understood, that in consequence of the said payment, the said Bernard and John, their heirs, executors, administrators and assigns, were freed and discharged from all further liability for the said damages, compensation, costs, charges and expenses ; and that the said " The President, Managers and Company of the Schuylkill Navigation Company," were to take upon themselves the risk of the same, be it more or less, [as in and by said articles of agreement among other things more fully appears.]

And the said Bernard in fact saith, that although the aforesaid sum of fifteen hundred dollars was duly and properly paid upon the execution of the aforesaid articles, by them the aforesaid Bernard and John, to the aforesaid " The President, Managers and Company of the Schuylkill Navigation Company," in accordance with the provisions of the aforesaid articles, and the covenants of the said Bernard and John therein contained ; and although he, the said Bernard, from the time of the making of the said articles of agreements, hitherto hath always been ready to perform, and hath fully performed all and singular those things in the same agreement contained, which on his part were to be performed, according to the true intent and meaning thereof ; yet the aforesaid " The President, Managers and Company of the Schuylkill Navigation Company," their covenants, promises, and agreements, in said articles contained and set forth, [although often required to do so] have not kept to the said Bernard, but have broken the same, and to keep the same to him have hitherto refused and still do refuse ; and have not, in accordance with and agreeably to their covenants aforesaid in the articles of agreement aforesaid contained, within one year from the day of the date of the articles of agreement aforesaid, raised their said dam called the Norristown dam, not less than eighteen inches above its height, as existing and being at the time of the execution of the same articles, throughout its whole extent ; nor have they, the said " The President, Managers and Company of the Schuylkill Navigation Company," [as by their said covenants in said articles they were bound to do] maintained, kept and supported said dam in good order eighteen inches higher than it previously was constructed and existed ; nor have they, the said " The President, Managers and Company of the Schuylkill

(M'Credy v. The Schuylkill Navigation Company.)

Navigation Company," in all cases of casualty repaired, reconstructed, and rebuilt the same dam as soon as was conveniently practicable thereafter; but on the contrary they the said " The President, Managers and Company of the Schuylkill Navigation Company," erected, built, constructed and raised their said dam [*430] so badly, improperly, and inartificially, that the *same was broken, and a part thereof carried away on or about the ninth day of January, in the year of our Lord one thousand eight hundred and thirty-two, and on or about the fourth day of February, in the same year, a large portion of the breast of the said dam, to wit, about eighty feet, were completely and entirely carried away, and they " The said President, Managers and Company of the Schuylkill Navigation Company," altogether refused and neglected to rebuild, reconstruct, renew and put said dam into good repair and order, for a long time, to wit, for the space of about one hundred days.

And the said Bernard in fact further saith, that since the reconstruction, renewing and rebuilding of the same dam by the said " The President, Managers and Company of the Schuylkill Navigation Company," the same dam has been rebuilt, renewed and reconstructed in so inartificial a manner, and so large a portion and quantity of improper materials have been placed by them the said " The President, Managers and Company of the Schuylkill Navigation Company," at, about, and around said dam, that the said materials have caused the water to back upon the wheels and works of the said Bernard, and have in a great measure deprived the said Bernard of the benefit and advantage of said water power to which he is entitled under and by virtue of said before-mentioned articles of agreement; by reason whereof, and of the neglect of the said " The President, Managers and Company of the Schuylkill Company" to perform their covenants aforesaid, entered into as aforesaid in the articles of agreement aforesaid, the wheat, cotton, corn, and other mills and factories of the said Bernard were for a long time, to wit, for the space of about one hundred days, idle and unemployed, and the said Bernard deprived of any and every benefit, profit or advantage therefrom; and entirely and altogether deprived of the possession and enjoyment of the water power aforesaid, secured to him by the covenants contained and set forth in the articles of agreement aforesaid: and by reason of the inartificial manner in which said dam has been repaired and renewed, and the improper materials with which said dam has been so repaired and renewed, the said Bernard continues to be in a great measure deprived of all benefit and advantage from said before-mentioned water power, and of his mills and factories propelled by the same."

(M'Credy *v.* The Schuylkill Navigation Company.)

The defendants, having craved oyer of the covenants stated in the declaration, pleaded performance; upon which issue was joined.

Afterwards, on the 29th of November, 1836, an additional count was filed by the plaintiff, as follows:

"And the said Bernard, by his attorney aforesaid, in fact further saith, that whereas, by the articles of agreement aforesaid, made as aforesaid, in the years aforesaid, the said "The President, Managers *and Company of the Schuylkill Navigation Company," were bound, and have been for a long [*431] time bound, to erect, build and construct, and having erected, built and constructed, to uphold, maintain and support a dam of good materials, and in good order, across said river Schuylkill, from the middle of a small island, near the said Bernard M'Credy's wheat or corn mills aforesaid, to the southwestern shore of said river, in such a direction as would pass between the lower end of Barbadoes island, and a small island a few perches to the southward thereof, said dam in every part as near as may be, to be on a perfect level, and seven feet and eighteen inches in perpendicular height above the sheeting, under the water wheels of the said Bernard's wheat or corn mills aforesaid: nevertheless, the said "The President, Managers and Company of the Schuylkill Navigation Company," their covenants and agreements aforesaid, not regarding, did not build, construct and erect the aforesaid dam according to their covenants and agreements aforesaid, nor did they, the aforesaid "The President, Managers and Company of the Schuylkill Navigation Company," keep the same dam in good order; but on the contrary, they the said company erected, built, constructed and raised their said dam, so badly, improperly, and inartificially, that the same dam was broken and a part thereof carried away, on or about the ninth day of January, in the year of our Lord one thousand eight hundred and thirty-two; and on or about the fourth day of February in the same year, a large portion of the breast of the said dam, to wit, about eighty feet, were completely and entirely carried away, by reason whereof a large quantity of earth, stone, gravel, rubbish, and other materials, together with the backing of the said dam and the bed of the said river, or a portion thereof, were by the force and power of the current of the stream or river carried down the same, and deposited in the bed of the river, about, around, opposite to and below the mills and factories aforesaid, of the said Bernard, by which the course of the river was impeded, and the water of the same backed on and upon the the sheeting, wheels and works of the said Bernard, in and about his aforesaid mills and factories, by reason whereof the wheels of the said mills or factories have been clogged with water, impeded,

(M'Credy *v.* The Schuylkill Navigation Company.)

injured and destroyed, and the said Bernard in a great measure deprived of the use, profit, benefit and advantage of said water power, to which he is entitled under and by virtue of said before-mentioned articles of agreement, and of the use and benefit, profit and advantage of his said mills and factories.

And the said Bernard in fact further saith, by his attorney aforesaid, that whereas, by the articles of agreement aforesaid, made as aforesaid, in the years aforesaid, the said "The President, Managers and Company of the Schuylkill Navigation Company," were bound, and have been for a long time bound, to erect, build and construct, and having erected, built and con-[*432] structed, to uphold, *maintain and support a dam of good materials across the said river Schuylkill, from the middle of a small island near the said Bernard M'Credy's wheat or corn mills aforesaid, to the south-western shore of said river, in such a direction as would pass between the lower end of Barbadoes island, and a small island a few perches to the southward thereof, said dam in every part, as near as may be, to be on a perfect level and seven feet and eighteen inches in perpendicular height, above the sheeting, under the water-wheels of the said Bernard's wheat or corn mills aforesaid: nevertheless, the said "The President, Managers and Company of the Schuylkill Navigation Company," designing to hinder and · obstruct the said Bernard M'Credy in the use and enjoyment of his said mills and factories aforesaid, to deprive him of all profit, benefit and advantage from the waters of the said river, and to prevent him, the said Bernard, from applying the said waters for the purpose of mill power or otherwise, as under the provisions of the agreements aforesaid, made as aforesaid, in the years aforesaid, he had right, power, and authority to do, altogether neglected and refused to erect, build, raise and construct a dam as aforesaid, whereby the said Bernard, for a long time, to wit, from the thirty-first day of August, in the year of our Lord one thousand eight hundred and thirty, until the eighth day of August, in the year of our Lord one thousand eight hundred and thirty-four, and long before and ever since, was deprived of the benefit and use of the waters to which, under the agreements made as aforesaid, in the years aforesaid, he was entitled, and of the use and benefit of his said mills, in as full, ample, and large a manner, as under the agreements aforesaid, made as aforesaid, he had the right to use the same, and of all profit and advantage therefrom."

On the 1st of September, 1837, the defendants, by leave of the Court, withdrew the plea of performance, so far as the same was pleaded to the articles of agreement declared upon by the plaintiff, and alleged to be dated the 8th day of October, 1819, and as to the· said alleged articles, so dated, pleaded *non est*

(M'Credy v. The Schuylkill Navigation Company.)

*factum;* and abided by their pleas already entered as to the other matters declared upon by the plaintiff.

Upon these issues the cause came on for trial before Darlington, President, on the 23d of October, 1837, when the plaintiff's counsel called George Emlen, a witness, who testified in substance as follows:

"On the evening of the 8th October A. D. 1819, I received a written paper at Norristown, from Mr. Samuel Mifflin, or Mr. Levi Pawling, or one or both of them.   It is now eighteen years since that paper was delivered to me, and I cannot say for what purpose it was delivered to me; nor can I say that any specific purpose *was stated.   I should not have delivered up [*433] that paper unless the consent of both parties had been obtained; nor did I deliver it up until I thought that consent had been obtained.   I presume, but this is matter of inference, that Mr. Mfflin represented the Schuylkill Navigation Company (the defendants.)   I kept that instrument for many years.   My memory is not charged with any instructions that both parties were to have access to it.   I spoke to Joseph S. Lewis, on more than one occasion on the subject of this paper, and desired to give it up, as I did not wish to be the depositary of it.   Upon one occasion Mr. Lewis told me, I might give up that paper, that all the parties consented that it should be given up; and I delivered it up, to some one, in the presence of Mr. Lewis and the representative of Mr. Levi Pawling, who, I think, was Mr. Thomas Kittera.   This occurred in his office.   I always understood this paper to relate to the rights of the defendants and Mr. L. Pawling to the water of the river Schuylkill; but I can't say if I got this impression from reading that paper, or from conversation.   I have not seen that paper since I gave it up.   I kept no copy of it.   I cannot distinctly say if any thing was done at the time of its delivery to me.   I have a confused notion that there was a table, and the usual apparatus for writing in the room.   I did not recollect the day nor the year, of this occurrence, and I referred to a little diary which I kept, and by it I found, that I was at Norristown, with Mr. Samuel Mifflin, Mr. Poinsett, and Dr. Mifflin, on the 8th and 9th of October; and I never was there with them except when this paper was delivered.   I do not think the president of the company or myself referred to the contents of the instrument: though I read it, I cannot say it was the same with the copy shown me.   Mr. Lewis was the President of the Schuylkill Navigation Company, and I spoke to him as such.   I have no recollection of what fell from Mr. Lewis, except that he was interested in this instrument.   I cannot say when I delivered up

(M'Credy *v.* The Schuylkill Navigation Company.)

this instrument; think it was more than five, and less than ten years ago."

On his cross-examination the witness said,—

"I moved into my present residence in 1830–'31. I was living in my present house in the cholera season, and probably moved there in 1831. I recollect placing that paper in a particular drawer; and I think that drawer was in my present house; but I would not have the Court or jury rely at all upon my recollection of this fact."

The plaintiff's counsel then read a notice to produce the original or counterpart of the agreement of October 8th, 1819, which had been duly served on the defendants, dated October 14, 1837.

[*434] *To which call the defendants replied, that they had not, and never had, the instrument called for.

The plaintiff then offered himself to prove that he had made diligent search for this paper, and could not find it. And being sworn on his *voire dire*, he said—

"I never saw the instrument in question: and never had it in my possession. I heard of it in the hands of Mr. Emlen. I purchased my property in 1825, if my memory serves me right."

The counsel for the plaintiff then gave in evidence, certain articles of agreement, dated the 31st of August, 1830, between the Schuylkill Navigation Company, and John Savage, and Bernard M'Credy, as set forth in the declaration.

The plaintiff's counsel then called Samuel R. Wood, a witness, who testified in substance as follows:—

"I have resided at Norristown. I went there in 1824, and left there in 1829, or thereabouts. The plaintiff and myself purchased from Levi Pawling, all the Bull property on the Schuylkill, water-power and all: we also purchased a property from Mr. Markley, extending down the Schuylkill to De Kalb street. I took the lower, and the plaintiff the upper part, next to Norristown dam.

I know of an agreement made between Levi Pawling and the Navigation Company, relating to the water-rights of the river Schuylkill. It is difficult to speak positively, but my impression is clear, that I saw in the office of Thomas Kittera, Esq. an instrument of writing executed by the Schuylkill Navigation Company with the seal of the company to it; being, or purporting to be an agreement, between Levi Pawling on the one part, and the Schuylkill Navigation Company on the other part. I well recollect the stipulations of that agreement, but I cannot say who the witnesses were. It never was in my possession. I know the whole history of it. It was an *escrow*, that is what I

(M'Credy v. The Schuylkill Navigation Company.)

believe the lawyers call it. George Emlen told me he had that paper, and Thomas Kittera told me he had borrowed it from him. I feel confident the president's name was to it, and the seal of the company also; but I cannot say if there was any other name than Cadwalader Evans."

The plaintiff's counsel then offered to prove the contents of the said paper; which evidence was objected to by the counsel for the defendants, and rejected by the Court.

The counsel for the plaintiff, then, by leave of the said Court, and without objection, amended the declaration, by striking out the profert of the articles of agreement, dated the 8th of October, A. D. *1819, and alleging that the same had been lost or destroyed by time or accident, &c.    [*435]

The counsel for the plaintiff then called Samuel R. Wood again, who deposed as follows:—

"I was acquainted with the situation of the Norristown dam previous to the 9th January, 1832. I resided at Norristown, and at my works up to the first of August, 1829, and was daily and almost hourly in sight of it. My works were immediately below it."

The counsel for the plaintiff then proposed to ask the witness what was the state and condition of the Norristown dam when he was there; which question was objected to because it referred to a period anterior to the month of August 1830.

The Court overruled the question, and decided that no evidence of the insufficiency of the said dam, or of its state or situation previous to the month of August, 1830, should be given; adding that "the first covenant in the agreement of 31st August, 1830, was to raise the Norristown dam, as it then existed, eighteen inches within a year; and by the ninth covenant, they had liberty to rebuild if necessary, on the same foundation; and whether the dam was good or bad before that time, in its foundation or otherwise, must be an irrelevant inquiry, for it was that dam such as it was, which was to be raised. Evidence of the height of the dam is, however, relevant, for it was to be raised eighteen inches; but evidence of its sufficiency, or insufficiency, or its permanence prior to the covenant to raise it, is irrelevant."

The counsel for the plaintiff thereupon excepted to the opinion and decision of the court upon this point.

The plaintiff then called Thomas Kittera, Esq., a witness on his behalf, who testified as follows:—

"I have searched on several occasions for the first agreement. I refer to an instrument between Mr. Levi Pawling and the Schuylkill Navigation Company. I do not know its date. I cannot say that I did receive such an instrument from George

(M'Credy *v.* The Schuylkill Navigation Company.)

Emlen. I acted as a friend of Mr. Levi Pawling, in his negotiations with the company. I have a recollection that there was an agreement between them, and at the time I was perfectly familiar with its character. My recollection is, that I have seen that instrument, but upon what occasion I am unable to say. I have also a recollection that a paper of that character was placed for some purpose I cannot tell what, by the parties in the hands of George Emlen. I think Mr. Emlen on one occasion called at my office, or spoke to me some where else, in consequence of a [*436] call upon him to bring that *paper into Court at Norristown, for what purpose I cannot recollect. That is the paper for which I have made search. I kept the papers of the mill property of L. Pawling, which afterwards became M'Credy & Wood's, by themselves together. Were that paper in my possession, my belief is, it would be in that bundle. These papers I have examined, and find it is not with them. In addition to which, I have made search in every place where I supposed that that paper, if in my possession, would be; and from the search I have made, I believe I have it not in my possession. The words 'Wood & M'Credy,' (on a paper shown to witness) are in my handwriting, and that paper has therefore been in my possession. I cannot say where I got it."

The plaintiff then called James M. Pawling, Esq. a witness on his behalf, who testified as follows.

" Since the Autumn of 1831, I have been in the possession of all my father, Levi Pawling's papers, and have exclusively attended to all his business; his health prior to, and since that period has been such as to prevent his attention to any business whatever. I have searched several times among his papers, and in other places for this instrument, and have no doubt that it is not among his papers. His health is better now, but it would be dangerous for him to attempt a journey like this. Excitement brings on gout. My father's indisposition has affected his memory. He is perfectly sane, but his memory is affected."

The plaintiff then called Samuel R. Wood again, and offered to prove the contents of the said instrument.

Which evidence was objected to by the counsel for the defendants, and rejected by the Court, who said (among other reasons) that if Mr. Pawling could not come, his evidence should have been taken.

Whereupon the counsel for the plaintiff excepted to the opinion of the Court.

The plaintiff then called Philip Koplin, a witness on his part, who testified as follows:—

" I have resided for a long time at Norristown; since 1801. Levi Pawling built the abutment of stone which connects with

the company's dam. Both the abutment and dam went on at the same time together in 1819. The part other than the abutment was built by the company under the directions of Cooley. The part put up by Mr. L. Pawling was one hundred and fifty feet in length from the saw mill, and joined on the centre of the little island, with the *company's dam. It was ten feet [*437] in height from the low water below the dam. The wood work of the company's dam was raised seven feet from the sheeting of the dam. That was the intention, though it was not quite level. The stone work was three feet higher. Mr. Pawling's part has stood. The Navigation Company's dam was raised in 1830. Said to be raised eighteen inches. It was not all finished. There were fifty to seventy-five feet in several places, including the whole left unplanked. More or less of the sheeting logs had been carried away. They were never replaced. Could not be replaced. I perceived some of the sheeting logs were loose. Underneath it had got worn out hollow before they raised the dam. The dam might perhaps have stood if the planking had been on it; but I never worked at it. Nathan Hallowell, who was the agent of the company, asked me in the autumn of 1830, if I could plank the dam. I told him I would do it almost any time, when I could get the plank. I am a carpenter. He told me he thought the plank was ready sawed at Freedly's mill, and I must go and see if they were there. I said I would. Mr. Freedly told me, that except a few they were not sawed. I thought it not worth while to begin with a small number. I told Nathan a few days after, that the plank was not sawed. Nathan said he would see about it, and let me know when they were ready. I had no further conversation with him at that time, that fall or winter about the dam. In the summer or fall of 1831, we were walking about a little, and I met him near, and told him I thought it a proper time to plank the rest of the dam. He said he thought so too, and would get Charles Ramsey to do it, but he was very busy. I told him I thought the sooner it was done the better; and so we parted."

The plaintiff then again offered to prove the contents of the said agreement of 1819, under which the dam and abutment aforesaid, were respectively built by L. Pawling and the company, to which evidence the defendants objected, and the same was overruled and rejected by the Court.

Whereupon the plaintiff excepted to the opinion of the Court.

Evidence was given on both sides, respecting the injury to the dam, the consequences to the plaintiff's works, and the extent and character of the repairs made by the defendants. Among other witnesses examined, were two, viz. Nathan Hallowell, and Robert Hallowell, who testified that they were the agents of the

(M'Credy *v.* The Schuylkill Navigation Company.)

company and superintendents of the works, and as such, were employed in raising the dam in 1830, and directing the repairs in 1832. The testimony of these witnesses was objected to by the plaintiff's counsel, on the ground of their being interested, but it was admitted by the Court, and exceptions taken.

[*438] *The jury found a verdict for the defendants; whereupon the plaintiff removed the record, and assigned the following errors.

"1. That the Court erred in refusing to allow the plaintiff to give evidence of the contents of the articles of agreement dated in 1819.

2. That the Court erred in refusing to allow the plaintiff to give evidence of the insufficiency of the dam, or of its state or situation previous to the 9th of August, 1830.

3. The Court erred in allowing the evidence of Nathan Hallowell to be given to the jury.

4. That the Court erred in refusing to direct the jury to disregard the evidence of N. Hallowell, and to have the same stricken out from the testimony in the cause.

5. That the Court erred in allowing the deposition of Robert Hallowell to be read to the jury.

6. That the Court erred in not directing the jury to disregard the evidence of Robert Hallowell, and in not having the same stricken from the testimony in the cause."

Mr. *Williams,* for the plaintiff in error.

1. The Court ought to have allowed the plaintiff to give evidence of the contents of the agreement of 1819. The testimony of the witnesses, Emlen, Wood, Kittera and Pawling, sufficiently proved the existence and loss of the paper, and we were entitled to go to the jury, upon the question of its delivery. Strict proof of the execution of a lost deed has never been required: it is enough, if it is shown to have existed. 1 Ves. 389. The sole question for the Court is, whether the loss has been proved. *Jackson* v. *Frier,* (16 Johns. Rep. 193). By the first plea of these defendants, the execution and existence of the instrument were admitted. The proof of a delivery is very strong. It was delivered by Mr. Emlen to Mr. Kittera, who was attorney for Pawling, and this amounted to a delivering to Pawling. At all events, it was sufficient to authorize the jury to pass upon it. It was not necessary to examine Mr. Levi Pawling, because, from the testimony of Mr. Emlen, it appears probable, that the instrument was not delivered until 1831; and after that time, Mr. Pawling was not the legal possessor of the paper. *Doxon* v. *Haigh,* (1 Esp. N. P. Cases, 409); *Cooke* v. *Tanswell,* (8 Taunt. 450; s. c. 4 Eng. Com. Law Reps. 163); *Meeker* v. *Jackson,*

(M'Credy *v.* The Schuylkill Navigation Company.)

(3 Yeates, 442); *King* v. *Morton*, (4 Maule & Selwyn, 48); *Gully* v. *Bishop of Exeter*, (4 Bingh. 294; s. c. 13 Eng. Com. Law Reps. 439); *Kensington* v. *Inglis*, (8 East, 273); *Cauffman* v. *Cedar Spring*, (6 Binn. 59); *Brown* v. *Woodman*, (6 Car. & Payne, 206; s. c. 25 Eng. Com. Law Reps. 358).

*2. If the first error is made out, it follows of course, [*439] that the evidence under this head ought to have been admitted. At all events, under the agreement of 1830, we had a right to give this evidence. We could have shown, that at the time of the execution of the second agreement, the dam was so weak, as not to be able to support the additional eighteen inches required by that agreement, and that one of the inducements to our making that agreement was, that it was necessary that the dam should be put into proper order to bear the additional weight. The offer and rejection were general. We did not adopt the dam as it stood in August, 1830. The expressions are large, and they ought not to be so construed, as to authorise a building upon an insufficient foundation.

3. The witnesses whose testimony was objected to by us were both superintendents. Through their negligence in altering the dam, the breaches took place. It is settled, that where the gist of the action is the negligence of a servant, the latter is not a competent witness. *Green* v. *New River Co.* (4 Term Rep. 589). Here, through the negligence of the witness, the dam was left unplanked, by reason of which the mischief took place. *Martin* v. *Henrickson*, (2 Ld. Raym. 1007); *Aislabie* v. *Rice*, (8 Taunt. 454: s. c. 4 Eng. Com. Law Reps. 164); Peake's N. P. 84, 117; *Miller* v. *Falconer*, (1 Campbell, 251).

Mr. *Dillingham* and Mr. *B. Tilghman*, for the defendants.

1. If there was any agreement executed and delivered in 1819, it was expressly annulled by the agreement of 1830.

[The counsel were here told, that it was unnecessary to argue this exception.]

2. The terms of the agreement of 1830 are sufficiently clear and explicit. The words "raise the said dam," mean the dam as it then stood. The agreement is prospective entirely. It contains no insurance of the condition of the dam prior to its date. In point of fact, some evidence of the state of the dam prior to 1830 was given; and therefore the Court will not reverse on this exception. *Crouse* v. *Miller*, (10 Serg. & Rawle, 155).

3. The interest of a person offered as a witness must be direct and certain, either as regards immediate benefit, or for the purposes of evidence. In all the cases cited on the other side, the issue was upon the negligence of the agent, which was not the case here. 2 Starkie, 745, 753; *Wakely* v. *Hart*, (6 Binn.

(M'Credy *v.* The Schuylkill Navigation Company.)

319); *Hayes* v. *Grier*, (4 Binn. 83); *Bennet* v. *Hethington*, (10 Serg. & Rawle, 195). The witnesses in this case were not contractors, but merely agents of the officers of the company.

Mr. *Meredith*, in reply.

1. The fact of the deed of 1819 having been released by that of 1830, has nothing to do with the question of the admissibility [*440] of the *contents of the deed of 1819. On *non est factum*, the release could not thus be taken advantage of. Suppose that the deed of 1819 was delivered to Emlen as an *escrow ;* yet if made a deed afterwards, it would take effect from the time of delivery as an *escrow.*

2. It was material to the plaintiff to show the state of the dam prior to August, 1830. It was to be raised and kept in repair ; and unless its condition prior to August, 1830, can be known, there is no time with which its situation after 1830 can be compared. Certainly we ought not to have been confined to the very day on which the agreement was signed, when the question was as to the situation of the dam generally, or about that time.

3. The negligence of the witnesses was proved ; and that negligence is shown to have caused the disaster. They prove their own interest, in showing that they were superintendents. The verdict in this case would be evidence in a suit by these defendants against the witnesses, to show the amount of the damages which they have sustained by their negligence or misconduct.

GIBSON, C. J., delivered the opinion of the Court.

As was determined in *M'Reynolds* v. *M'Cord*, (6 Watts, 288,) evidence of contents must be preceded by proof of existence, which includes proof of execution. The rule has long been established, with this qualification, however, that proof of suppression or destruction, by the party to be affected, where no better can be had, be taken for proof of execution. That, however, is strictly not a qualification, but a subjunction of the rule, that the best evidence be produced. How stood the preliminary proofs, when the offer was submitted ? Of delivery, which is an integrant part of execution, there was no colour. On the contrary, the only witness who touched the fact, declared, that the instrument had been put into the hands of Mr. Emlen, its depositary, as an escrow ; and the latter did not recollect on what occasion, or, with certainty, to whom it was given up. There is little doubt, however, that having been retained as a security for something left undone by the plaintiff's predecessor in the contract, it was given up in the presence of the parties to it, when previous stipulations were merged in the present covenants ; and

(M'Credy v. The Schuylkill Navigation Company.)

it would seem, that it had not in fact become a deed—at least, there was no spark of proof that it had. There was therefore not only no proof of execution, but actual disproof of it; and in these circumstances, proof of contents was altogether inadmissible. Besides, the recollection of Mr. Pawling, who, had the paper become a deed, might have been its possessor, ought to have been consulted.*

The condition of the dam, previous to the only agreement that has been produced, was properly excluded from consideration. That this agreement was made to settle and satisfy past differences, *as well as to provide for the future, is expressly declared in it; and that the evidence excluded [*441] could have legitimately made the defendant liable on the original covenants, if any had existed, is not pretended. But as he covenanted to maintain the dam at an increased height, and, casualties excepted, in good condition, it is said he was bound to build on a foundation capable of supporting the superstructure; and this, it is urged, the evidence would have shown he had not done. By the contract, however, he was held no further than to put the additional superstructure on the existing one; and such being the words, each party took on himself the risk of its sufficiency. Had the fitness and stability of the original dam been a matter for subsequent determination, there ought to have been a provision for a survey of it; but that it would be sufficient to resist the ordinary pressure of the current, was taken for granted: and for the consequences of floods, the defendant was bound no further than to repair or rebuild—to rebuild, however, not in the first instance, but only when experiment should prove it to be necessary. Evidence, therefore, that it would have been better to rebuild in the first instance, could have tended only to mislead.

Neither was the witness to whose testimony exception was taken, disqualified by interest. He was not in the predicament of a servant contingently liable to his employer for the event. He was in the defendant's service as superintendent of repairs; but the nature of his duties is not shown, or that he disobeyed his instructions and acted tortiously of his own head. He may have been, and probably was, no more than an overseer; and if he failed to keep the labourers duly at work, his neglect in that particular might make him answerable to the defendant, but it could not make the defendant answerable to the plaintiff. The argument is, that there may have been delay in the execution of his task, and a correspondent hindrance of the plaintiff's business: but, in default of counter proof, the presumption is in favour of

* See 5 Casey, 377.

diligence; and even the possibility of being secondarily liable to an action for it, is classed with those remote and contingent interests which go to credibility. A declaration for consequential loss from the act of a servant, contains an averment of negligence or misfeasance, which must be proved; and to maintain it against the master, necessarily requires the plaintiff to make out a case for the master against the servant, which the servant, is consequently incompetent to disprove; but the eventual liability of the witness, here, is by no means a postulate of the action, and a possibility of liability is insufficient to exclude him. The want of a direction to disregard the testimony of certain witnesses, has not been pressed: nor could it be, as no prayer for direction seems to have been submitted.*

Judgment affirmed.

Cited by Counsel, 4 Wharton, 497; 7 Watts, 171; 10 Id. 14; 1 Barr, 51; 3 Id. 198; 2 Jones, 210; 8 Harris, 285; 12 Casey, 358.
Cited by the Court, 6 Watts & Sergeant, 369.

